# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARILYN PARKER,          )
                                 )
        Plaintiff,        )
                                 )     No. 16 C 4042
     v.                    )
                                 )     Judge Sara L. Ellis
TRISTA HARPER, individually, and   )
CHICAGO BOARD OF EDUCATION FOR  )
THE CITY OF CHICAGO,      )
                                 )
        Defendants.    )

## OPINION AND ORDER

Plaintiff Marilyn Parker, a former Chicago Public Schools teacher, lost her job as a special education teacher at Manley Career Academy High School ("Manley") as part of mandated layoffs in December 2015. In this action filed pursuant to 42 U.S.C. § 1983 against Defendants Trista Harper, Manley's principal, and the Chicago Board of Education for the City of Chicago (the "Board"), Parker claims that Defendants retaliated against her for engaging in speech protected by the First and Fourteenth Amendments and deprived her of substantive due process. Defendants have filed a motion for summary judgment. Although the Court concludes that Parker's speech to a reporter concerning alleged attendance fraud at Manley amounts to constitutionally protected speech, Parker has only created a disputed issue of fact as to whether Harper retaliated against her for that speech in connection with Parker no longer receiving summer substitute teaching assignments. The remaining aspects of Parker's First Amendment retaliation claim against Harper fail, and she also has not produced sufficient evidence to allow this claim to proceed against the Board. Finally, because Parker does not have a protected

property interest in her continued employment in the case of an economic layoff, the Court grants judgment for Defendants on Parker's substantive due process claim.

## BACKGROUND[1]

Parker began working as a special education teacher at Manley in 2001. Harper served as the interim principal at Manley from July 2014 until May 2015, when she officially became its principal. The Board operates Manley, subjecting Parker, as a Board employee, to the Board's Rules and a collective bargaining agreement ("CBA") between the Board and the Chicago Teachers Union ("CTU"). The CBA governed the order of layoffs for teachers and the teacher evaluation process.[2]

## I.     Parker's 2014-2015 Teacher Evaluation

The teacher evaluation process, known as "REACH," consists of an overall score and a descriptive summative rating of excellent, proficient, developing, or unsatisfactory. Each tenured teacher received an evaluation on either an annual or biannual basis. Objective and subjective components encompassed a teacher's rating. The objective component, labeled performance tasks, comprised thirty percent of the overall score and came from student scores, with the principal playing no role in the objective component. The subjective component, titled professional practice, made up the remaining seventy percent of the score and was based on formal and informal observations of the teacher's performance by the principal or a designee. Each component had a score between 1.00 and 4.00, with the overall REACH score the sum of

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts and Parker's additional statement of facts. The Court has considered Defendants' objections to Parker's additional statements of fact and supporting exhibits and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to the resolution of the pending motion for summary judgment. All facts are taken in the light most favorable to Parker, the non-movant.

[2] The relevant CBA came into effect on July 1, 2012.

the objective score multiplied by 30 and the subjective score multiplied by 70. Summative ratings were assigned as follows: excellent for a score of 340 to 400, proficient for a score of 285 to 339, developing for a score of 210 to 284, and unsatisfactory for a score of 100 to 209.

For the 2014 to 2015 school year, Harper evaluated Parker for her review, with informal observations occurring on October 6, 2014, and February 9, 2015, and formal observations taking place on December 2, 2014, and March 30, 2015. Harper's subjective score equated to a developing summative rating. Harper noted significant shortcomings in Parker's teaching and lesson planning, but Parker disagrees with Harper's criticisms and claims Harper had ulterior motivations in giving Parker her evaluation. According to Parker, on March 20, 2015, and during a meeting in April 2015, Harper threatened to give Parker a negative evaluation. Parker also testified that, during her formal observation on March 30, 2015, Harper told her, "you know what we have to do to your evaluation," apparently referring to the fact that teachers, including Parker, had expressed disagreement with how Harper wanted to conduct certain school issues. Doc. 85 ¶ 75. Harper's role in the evaluation process concluded in April 2015, at which time Parker knew she would likely receive an overall unsatisfactory rating. Indeed, Parker received an overall REACH summative rating of unsatisfactory, comprised of a developing subjective rating and an unsatisfactory objective rating.

## II. Parker Reports Attendance Fraud Issues at Manley

Beginning in 2012, Parker belonged to the Professional Problems Committee ("PPC") at Manley. The PPC included the principal, support personnel, and teachers. It discussed school operational issues and potential improvements. Its mandate was also to bring serious issues to the administration's attention. In 2014 and 2015, Parker and others on the PPC learned of potential attendance fraud issues. To Parker's knowledge, the Manley PPC never discussed

these perceived attendance tracking issues with Harper.  Parker also did not bring the issue up with Harper, despite having a responsibility to raise issues at the school with administrative personnel as a PPC member.  Tonya Butler, another Manley teacher, claims that she told Harper of attendance tracking issues, but Harper denies having had any such conversation.  Parker testified that Harper was generally unresponsive and hostile when the PPC sought to address concerns with her and refused to discuss issues she did not want to address.  For example, the PPC had distributed a survey to Manley teaching staff in the second semester of the 2014-2015 school year addressing issues such as leadership, discipline, evaluations, classroom visits, and teacher self-worth.  Harper refused to discuss this survey at an April 2015 PPC meeting because it was not a CPS-approved survey.  But Harper states she indicated she would discuss a CPS-approved survey on such topics at the appropriate time.

Instead of going to the administration, in June 2015, Parker, along with two other Manley teachers, Valentina Sorescu and Butler, and CTU Field Representative John Kugler, met with Kate Grossman, a reporter, about alleged attendance tracking issues at Manley.  Specifically, Parker told Grossman that when teachers marked students as absent, school personnel would later change the entry to present under the code "school function."  Doing this boosted Manley's attendance data.  Parker also provided Grossman with documents, including student attendance data, to support these claims.

On July 6, 2015, *The Atlantic* published an article Grossman wrote about Chicago schools titled "What Schools Will Do to Keep Students on Track," which included information she obtained from meeting with Parker and the other Manley teachers.  The article cited records provided by the three Manley teachers, quoted Parker by name, and referred to the other two teachers anonymously.  It also indicated that the Board's Office of the Inspector General

("OIG") was investigating Manley. Harper learned of the *Atlantic* article that day from the Board's Network Chief, Wanda Washington, who emailed Harper stating, "Ms. Parker and other teachers did not paint Manley in a good light." *Id.* ¶ 46. Before the article, Harper did not know of the OIG's investigation.[3]

The OIG investigates alleged waste, fraud, and financial mismanagement. All Board teachers must cooperate with OIG investigations, pursuant to the Board's rules and Illinois state law. After the publication of the *Atlantic* article, the OIG contacted Parker to interview her about the attendance issues. Parker met with the OIG on July 17, 2015, cooperating with their questioning. Parker did not tell Harper about her OIG meeting and does not know if Harper knew of the meeting.

### III. Alleged Retaliation

Over the summer of 2015, Parker worked as a substitute teacher at Manley as part of a bridge program for incoming ninth graders. Butler assigned the substitute teachers for the program, filling substitute positions from an approved list. Alternatively, a teacher could directly reach out to Parker and request that Parker substitute for that teacher. Harper did not directly assign substitute teachers, and Butler did not contact Harper to discuss substitute teaching assignments for the bridge program. But after the *Atlantic* article came out, Butler learned through an intermediary, Melinda Jean-Baptiste, that, per Harper, Parker was no longer allowed to substitute teach in the bridge program, information that Butler then relayed to Parker. Parker had already been asked to substitute for several teachers when Butler told her she could no longer substitute teach over the summer.

---

[3] The OIG later recommended Harper's termination as Manley's principal for her involvement in the attendance fraud at Manley, but the Board did not terminate Harper and no one informed Harper that charges for removal were being considered or filed against her.

Parker returned to Manley for the 2015-2016 school year. But in September 2015, Parker claims Harper questioned her about her participation in the *Atlantic* article. Parker testified that Harper told Parker that she is "loyal to the people who are loyal to [her]." *Id.* ¶ 83. Harper denies that such a conversation took place. Parker claims Harper made a similar statement in November, when she called Parker to her office to discuss schedule adjustments, but again, Harper denies any such interaction. Also in November 2015, Harper approached Parker in the school hallway, asking her why she was not in a class. Although Parker explained that she did not have a class to teach that period, Harper insisted that Parker did and called a school counselor who handled scheduling to check. The counselor corroborated that Parker did not have an assigned class at the time. Parker admits that Harper legitimately questioned her, disagreeing instead as to the manner in which the questioning took place.

Manley's enrollment for the 2015-2016 school year was significantly lower than expected, with only approximately sixty freshmen enrolled and twenty fewer special education students than the previous year reported on the tenth school day, when the Board determines attendance for budgetary purposes. Because Manley's enrollment dropped, Harper learned on September 14 that Manley would lose special education teaching positions. Harper appealed to the Office of Diverse Learner Support and Services ("ODLSS") on October 7 and 10, seeking to keep some of these teaching positions, but ODLSS denied the appeal on December 2. Manley lost four special education teaching positions, but because two of its special education teachers had either resigned or moved to other schools since the beginning of the school year, the Board had to lay off only two teachers.

The Board's Talent Office ensures that the applicable CBA provisions are followed in determining which positions are eliminated for budgetary reasons. Appendix H of the CBA,

concerning teacher layoffs for economic reasons, provides the order for layoffs when only some teachers' positions are eliminated, as follows:

1. Any teachers rated unsatisfactory;
2. Any substitute or temporary teachers;
3. Probationary appointed teachers by performance tier (emerging: 209-250 score; developing: 251-284 score; proficient: 285-339 score; and excellent: 340-400 score).
4. Tenured teachers rated satisfactory or, after the first evaluation in the new evaluation system issues, first tenured teachers rated emerging (209-250 score) and then tenured teachers rated developing (251-284 score).
5. All other tenured teachers.

    Within each of the foregoing five tiers, teachers shall be displaced by inverse order of seniority, with the least senior teacher being laid off first.

*Id.* ¶ 62. Jerry Taylor, a Human Resources Generalist in the Talent Office, conducted the analysis for the Manley layoffs. He determined that the CBA required the Board to first lay off Parker because, unlike any other Manley special education teacher, she had an unsatisfactory REACH summative rating. Taylor informed Harper of the results on November 30.

On December 8, 2015, Harper informed Parker that her position at Manley was being eliminated for budgetary reasons. At that meeting, Parker received a letter from the Board indicating she would be laid off effective December 29, 2015, due to "Other Actions," defined in the CBA to include teacher layoffs based on "drops in enrollment whereby a [school] receives fewer positions . . . due to a decline in student enrollment." *Id.* ¶ 67. Parker filed a grievance concerning her layoff, but she subsequently resigned and retired on March 23, 2016, with her layoff retroactively classified as a retirement.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I.      First Amendment Retaliation

First, the Court considers Parker's First Amendment retaliation claim against Harper. To establish such a claim, Parker must show that "(1) [she] engaged in activity protected by the First Amendment; (2) [she] suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015)). The Court considers these elements in turn.

## A.    Constitutionally Protected Speech

For a public employee like Parker to have her speech protected under the First Amendment, she must show that (1) she spoke as a private citizen, (2) her speech addressed a matter of public concern, and (3) the government's interests as an employer in promoting effective and efficient public service do not outweigh her interest in expressing that speech. *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 792 (7th Cir. 2016).  Harper concedes, for purposes of this motion, that Parker's speech addressed a matter of public concern, so the Court need only consider the remaining two factors.  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006).  But a public employee's speech "does not lose protection simply because it 'concerns' or is 'acquired by virtue of [her] public employment," and so the Court must conduct an inquiry into Parker's job duties and whether the speech at issue falls within the scope of those duties. *Kristofek*, 832 F.3d at 793 (quoting *Lane v. Franks*, --- U.S. ----, 134 S. Ct. 2369, 189 L. Ed. 2d 312 (2014)).

The Court analyzes two instances of Parker's speech: (1) her speech to Grossman for the *Atlantic* article, and (2) her interview with the OIG.  Harper argues that Parker spoke in both instances pursuant to her job duties, maintaining that she learned of the alleged attendance fraud in her capacity as a PPC member and had the responsibility to report such fraud as a PPC member pursuant to CPS policy and Board rules.  Although this holds true with respect to her speech to the OIG—indeed Parker only half-heartedly contests this in her response—the Court cannot come to the same conclusion with respect to the conversation with Grossman.

Addressing the OIG speech first, the OIG approached Parker for an interview after the *Atlantic* article. As a CPS teacher, Parker had the duty to cooperate and answer the investigators' questions pursuant to Board Rules and state law. *See* Doc. 84-1 at 143 (Board Rule 4-4(m) provides that "[a]ll employees are obligated to cooperate with the Board's Inspector General in investigations or inquiries conducted by the Inspector General as required by 105 ILCS 5/34-13.1. Employees who are interviewed by the Inspector General or his/her authorized agents . . . are directed by the Board of Education to answer all questions by the Inspector General"). Parker also acknowledges she had an obligation to report falsified attendance records to the administration. Taken together, then, the Court concludes that Parker spoke to the OIG pursuant to her duties as a public employee, not as a private citizen. *See Sorescu v. Harper*, No. 1:15 C 10317, 2017 WL 1927696, at *6 (N.D. Ill. May 10, 2017) (coming to the same conclusion in nearly identical case where another teacher who spoke to Grossman and then was interviewed by the OIG filed suit claiming First Amendment retaliation for her speech to the OIG). Parker half-heartedly argues without citation that the Court should find otherwise because the only reason the OIG spoke to Parker was because she first independently spoke to the press about her concerns. But the Court does not find that this immunizes Parker's speech, where her job duties required her to speak on the issue with the investigators regardless of how they learned of the issue. Therefore, Parker cannot claim First Amendment protection for speaking to the OIG.

But the Court does find that Parker spoke to Grossman as a private citizen. Instead of pursuing official channels to report misconduct, such as raising the attendance fraud within the confines of the PPC, with Harper, or going to the OIG directly, Parker chose to speak with Grossman, a reporter. Parker made such speech outside the established channels for reporting

misconduct as a private citizen.  *See Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 904 (N.D. Ill. 2016) (contrasting speech made pursuant to official duties where misconduct is reported "in the manner directed by official policy, to a supervisor, or to an external body with formal oversight responsibility," with that made as a private citizen, where an employee "reports misconduct outside established channels or in violation of official policy").  This is particularly true here because Parker was reporting alleged fraud.  *See Kristofek*, 832 F.3d at 793 ("[W]e must be especially careful in concluding that employees have spoken pursuant to their official duties when the speech concerns allegations of public corruption.").  Although Harper cites to cases from outside the Seventh Circuit that have found that a report to the press on a subject related to an employee's job duties does not necessarily amount to citizen speech, *see, e.g.*, *Omokehinde v. Detroit Bd. of Ed.*, 563 F. Supp. 2d 717, 728–30 (E.D. Mich. 2008); *Dougherty v. Sch. Dist. of Philadelphia*, No. 12-1001, 2013 WL 5525642, at *11 (E.D. Penn. Oct. 4, 2013), *aff'd*, 772 F.3d 979 (3d Cir. 2014),[4] these cases are not binding on this Court and appear contrary to the Seventh Circuit's considerations of reports made outside of the official channels to "expose such official malfeasance to broader scrutiny." *Moral*es v. Jones*, 494 F.3d 590, 597 (7th Cir. 2007) (quoting *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006)).  Additionally, the Court does not place any weight on the fact that Parker, unlike Sorescu, spoke to Grossman on the record and not anonymously.  Both individuals took action outside of their official roles as teachers and PPC members to speak out about alleged fraud occurring within CPS.

---

[4] The Court acknowledges that the *Dougherty* court declined to adopt a "bright line distinction between internal and external speech (i.e., between speech within the employee's organization and outside the organization)" to determine whether an individual speaks as a private citizen or public employee, instead considering whether "it fell within the scope of the [individual's] duties to recognize the alleged misconduct as such and report it, whether to the media or any other party." *Dougherty*, 2013 WL 5525642, at *11.  But in that case, the court found that although the plaintiff acquired the information in the course of his job, his reports to the press did not fall within the scope of his duties and so he spoke as a private citizen, not as a public employee.  The facts of *Dougherty*, then, do not help Harper.

This does not end the inquiry, however, for the Court must also find that Parker's interest in speaking to Grossman outweighed her employer's interest in "promoting the efficiency of the public services it performs through its employees." *Swetlik v. Crawford*, 738 F.3d 818, 827 (7th Cir. 2013) (quoting *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011)). In balancing the employee's free speech and employer's management interests, the Court considers the following factors:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Kristofek*, 832 F.3d at 796 (quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000)). An actual disruption need not occur; instead, the Court must "give substantial weight to government employers' reasonable predictions of disruption," as long as those predictions are "supported with an evidentiary foundation and . . . more than mere speculation." *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1119 (7th Cir. 2013) (citations omitted) (internal quotation marks omitted). Harper argues that, by going to the press and accusing Harper of misconduct, Parker created the potential for disharmony in the workplace, particularly because they were supposed to work together to avoid conflicts that could potentially adversely affect students and the school's operation.

But Harper's argument sweeps too broadly, essentially asking the Court to take a blanket approach and find that any speech critical of the administration has the potential to disrupt school services and thus is not entitled to First Amendment protection. Although the Court may consider the potential for disruption, Harper must support her argument with more than mere

speculation, which is all that she has presented to the Court here. This is not a case, like *Craig*, where the employee's speech threatened the public trust and authority that the employer placed in him and that speech had the potential to interfere with the employee's job duties. *See id.* at 1119–20 (finding that the potential for disruption outweighed a school counselor's free speech interest in writing advice book on female relationships where the counselor "must maintain a safe space for his students in order to ensure they remain willing to come to him for advice" and the book's contents would likely make "female students . . . uncomfortable seeking advice from [the counselor]"). Nor did Parker's speech relate to personal complaints about Harper or other supervisors at Manley. *Cf. Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1017–18 (7th Cir. 1997) (finding employer's interest outweighed that of employee where employee's comments mainly involved private complaints she had about her supervisor). Instead, she spoke out about "actual wrongdoing or breach of public trust on the part of her superiors," and therefore requiring a "more substantial showing than otherwise that the speech is, in fact, likely to be disruptive before the employee's actions may be punished." *Id.* at 1018. Harper has not made this required substantial showing, relying instead on mere generalities. The Court therefore agrees with the *Sorescu* court's conclusion that Harper's interest in promoting effective and efficient public service did not outweigh Parker's interest in speaking to Grossman. *See Sorescu*, 2017 WL 1927696, at *8. As there, although Parker spoke critically of Harper and CPS, her speech has not been "shown nor can be presumed to have in any way either impeded [Parker's] proper performance of [her] daily duties in the classroom or to have interfered with the regular operation of the schools generally." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will County, Ill.*, 391 U.S. 563, 572–73, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). Additionally, Parker spoke to Grossman during the summer, when school was out of session, and even though

Parker was identified in the *Atlantic* article, she managed to continue teaching at Manley without significant disruption at the beginning of the next school year until her termination for budgetary reasons. *Sorescu*, 2017 WL 1927696, at *8. Therefore, the Court finds Parker's speech to Grossman constitutionally protected.

### B. Deprivation

The second element of Parker's retaliation claim requires a "deprivation 'likely' to deter free speech," which is "a standard considered more lenient than the Title VII counterpart of adverse action." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). "Any deprivation" may be actionable, "even something as trivial as making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday," as long as "the circumstances are such as to make [the deprivation] an effective deterrent to the exercise of a fragile liberty." *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). Harper challenges only two of Parker's claimed deprivations: being barred from substitute teaching in the summer of 2015 and questioned about whether she was supposed to be in class in November 2015.

The Court finds that being prohibited from substitute teaching would reasonably deter someone from further exercising her First Amendment rights, where the substitute teaching provides additional income to a teacher over the summer. But the Court agrees that the hallway incident in November 2015 does not amount to an actionable deprivation. Harper's actions amounted to no more than simple verbal harassment, ultimately resolved upon confirmation that Parker indeed did not have a class at the time Harper encountered her in the hallway. Parker even admits that Harper appropriately questioned her about her schedule, only disagreeing about the manner in which that questioning occurred. The evidence in the record does not suggest that Harper's actions in November 2015 would deter a person of ordinary firmness from exercising

her First Amendment rights.  *See Long v. Hammer*, 727 F. App'x 215, 217 (7th Cir. 2018)

("Hammer's 'yelling' at Long was not unlawfully retaliatory because 'simple verbal harassment'

is insufficient to deter a person of ordinary firmness from submitting grievances." (citation

omitted)).  The Court therefore proceeds to consider causation only with respect to Parker's loss

of substitute teaching positions and her layoff in December 2016, which Harper concedes

amounts to a deprivation.

### C.  Causation

At summary judgment, "the burden of proof for causation is divided and shifts between

the parties."  *McGreal*, 850 F.3d at 312.  First, Parker must provide evidence that her speech was

"at least a motivating factor—or, in philosophical terms, a 'sufficient condition'—of the

employer's decision to take retaliatory action against [her]."  *Kidwell v. Eisenhauer*, 679 F.3d

957, 965 (7th Cir. 2012) (quoting *Green v. Doruff*, 660 F.3d 975, 979–80 (7th Cir. 2011)).  If

Parker satisfies this initial burden, then it "shifts to the employer to rebut the causal inference,"

*id.*, which can be done "by offering an alternative explanation for the [deprivation], showing that

[the retaliatory action] 'would have been [taken] in the absence of the protected speech,'"

*McGreal*, 850 F.3d at 313 (quoting *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012)).  At

this point, the burden returns to Parker "to demonstrate that the proffered reason was pretextual

and that the real reason was retaliatory animus."  *Thayer*, 704 F.3d at 252.  The Court considers

the loss of substitute teaching opportunities and Parker's layoff separately.

### 1.  Loss of Substitute Teaching Opportunities

First, Harper argues that Parker has no admissible evidence to support her claim that

Harper kept her from substitute teaching assignments in the summer of 2015, after Parker spoke

to Grossman for the *Atlantic* article.  But Parker proffers Jean-Baptiste's deposition testimony, in

which Jean-Baptiste testified that pursuant to Harper's orders, Parker could no longer substitute teach at Manley for the summer. Harper claims without explanation that this statement is hearsay, but Harper's comments to Jean-Baptiste do not amount to hearsay because they are statements of a party-opponent. Fed. R. Evid. 801(d)(2). Therefore, the Court may consider this statement. Harper further argues, however, that Butler coordinated the summer substitute teaching assignments and thus Harper could not have prevented Parker from teaching during the summer. But a dispute exists on the issue—a reasonable juror could conclude from Harper's statement and the fact that Parker found herself prohibited from substitute teaching at Manley over the summer shortly after the publication of the *Atlantic* article that Harper retaliated against Parker for speaking to Grossman by keeping her from further substitute teaching over the summer at Manley.

## 2. Layoff

Parker also contends that Harper laid her off in retaliation for speaking to Grossman for the *Atlantic* article. Harper responds that Parker's layoff was required by the CBA's provisions for economic layoffs, which mandated that those teachers with an unsatisfactory rating be laid off first. Parker acknowledges that Harper followed the CBA's provisions when laying off the special education teachers at Manley in December 2015, instead arguing that Harper acted with a retaliatory motive or discriminatorily in giving her an unsatisfactory rating during the evaluation process between October 2014 and April 2015. For support, she claims that Harper made implied threats to her during the evaluation period and also raises issues about other teachers' reviews and treatment after complaining about attendance fraud charges. But none of this has any relevance to the issue of whether Parker's speech to Grossman was a motivating factor in her layoff because that speech took place several months after Harper finalized her review and so

could not have played any role in Harper's evaluation of Parker's teaching. *See Sorescu*, 2017 WL 1927696, at *8 (finding that speech could not be a motivating factor for layoff or other retaliatory actions where the defendant only found out about the speech after those actions took place). Instead, the only evidence the Court has before it indicates that the drop in attendance mandated a reduction in special education positions at Manley and the CBA required that Parker be the first of the special education teachers laid off based on her most recent evaluation. Even if that evaluation was tainted by improper factors, those improper factors do not relate to the constitutionally protected speech under consideration here. Therefore, Parker has not pointed to any evidence that would rebut Harper's proffered reason for her layoff. Because Parker could have been laid off based on her unsatisfactory rating even absent her protected speech, she cannot establish the required causation in connection with her layoff and so this aspect of her First Amendment retaliation claim must fail. *Milliman v. County of McHenry*, 893 F.3d 422, 434 (7th Cir. 2018).

### D.     Qualified Immunity

Because the Court finds a question of fact on the First Amendment retaliation claim with respect to the substitute teaching issue, it must address Harper's qualified immunity argument. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, --- U.S. ----, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017) (citation omitted) (internal quotation marks omitted). "[T]wo central questions must be addressed in the course of determining whether qualified immunity is available: whether the plaintiff has alleged a deprivation of a constitutional right at all, and whether the right at issue was clearly established

at the time and under the circumstances presented." *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016) (citation omitted).

Harper conclusorily argues that the law was unsettled in 2015 as to whether her alleged conduct was unlawful. She does not specify what area of law remained unsettled, leaving the Court to look broadly at the landscape of First Amendment retaliation law. And at that level, the Court disagrees. To the extent Parker can prove that Harper retaliated against her by preventing her from taking on additional substitute teaching during the summer school session because Parker spoke to Grossman, the Court cannot agree that the law surrounding whether such conduct was unlawful remained unsettled. Instead, it was clearly established that Harper could not retaliate against Parker for exercising her First Amendment speech rights. *See Kristofek*, 832 F.3d at 798–99 (collecting cases observing that the right to be free from retaliation for exercising one's First Amendment rights is clearly established); *Delgado v. Jones*, 282 F.3d 511, 520 (7th Cir. 2002) ("It has been well established for many years in this Circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights[.]" (quoting *Gustafson v. Jones*, 117 F.3d 1015, 1020 (7th Cir. 1997)). Therefore, qualified immunity does not protect Harper from Parker's claim.

### E. The Board's Liability

Parker also seeks to hold the Board liable on her First Amendment retaliation claim. She cannot hold the Board liable on a theory of *respondeat superior*. *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). Instead, Parker may establish liability by showing (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a

person with final policymaking authority. *Id.* The policy or practice "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (citation omitted) (internal quotation marks omitted).

Parker argues that a question of fact exists as to whether the Board had a custom of condoning retaliation for First Amendment complaints. For support, she relies on Sorescu's termination as a teacher at Manley in September 2015, also after speaking to Grossman, and another Manley teacher, Shana Robinson, deciding to leave Manley because she feared having her evaluation threatened. She also highlights Butler's complaints about attendance fraud. But another court in this district concluded that Harper did not retaliate against Sorescu. *See Sorescu*, 2017 WL 1927696, at *8. And no evidence exists in the record that Harper took retaliatory action against Butler or that Robinson exercised her First Amendment rights regarding her concerns with Harper's conduct. Therefore, Parker has failed to submit sufficient evidence for the Court to find the Board liable for First Amendment retaliation based on a custom of condoning retaliation for First Amendment complaints. *See Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (a single incident of misconduct cannot sustain *Monell* liability).

Alternatively, Parker argues that the Board should be held liable on a ratification theory. But to hold the Board liable on such a theory, Parker must show "that a municipal official with final policymaking authority approved the subordinate's decision and the basis for it." *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998). Here, the evidence in the record indicates that the Board complied with the provisions of the CBA in determining the teachers to lay off as part of the required reduction in force of special education teachers at Manley. Therefore, the Court cannot conclude that the Board may be held liable based on a ratification

theory.  *See Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009) ("The Board approved [the principal's] decision not to renew [plaintiff's] contract, but no evidence demonstrates that the Board was aware of any potential retaliatory basis for the nonrenewal.").

## II.    Due Process Claim

Finally, the Court addresses Parker's due process claim.  The contours of this claim are not particularly clear, with Parker devoting only a paragraph to the claim in her response brief. Although Defendants addressed both substantive and procedural due process arguments, because Parker focuses only on substantive due process, the Court does the same.  "[T]he scope of substantive due process is very limited," involving "the exercise of governmental power without reasonable justification." *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005).  Parker claims she had a protected property interest in her position as a tenured teacher protected by a collective bargaining agreement.  But the Illinois School Code does not provide "laid-off tenured teachers either a substantive right to be rehired after an economic layoff or a right to certain procedures during the rehiring process." *Chicago Teachers Union, Local No. 1 v. Bd. of Educ.*, 963 N.E.2d 918, 927, 2012 IL 112566, 357 Ill. Dec. 520 (2012).  Here, the evidence in the record makes clear that several special education teachers lost their positions at Manley in December 2015 for economic reasons because of decreased enrollment for the 2015-2016 school year.  Because Parker lost her position at Manley for economic reasons, she does not have a protected property interest on which to base a substantive due process claim.  *See Price v. Bd. of Educ. of City of Chicago*, 755 F.3d 605, 609–610 (7th Cir. 2014).

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion for summary judgment [81]. The Court grants summary judgment to the Board on all claims and for Harper on Parker's First Amendment retaliation claim as it relates to verbal harassment in November 2015 and the December 2015 layoff and Parker's due process claim. Only Parker's First Amendment retaliation claim related to substitute teaching assignments remains pending.


Dated: August 6, 2018

_____
SARA L. ELLIS
United States District Judge